stay in that microphone so that we can hear hear you the lights indicate your timing but as happens if you get the amber light and you haven't you're still stuck on the first point you might want to consider shifting gears to cover another point so you're not faced with rebuttal and trying to argue things that weren't brought up other than that we call the first case United States versus Montgomery Ms. Ling morning your honors Margaret Ling for Mr. Montgomery reading your brief and based on the government's brief at 39 it seems that it seems that you're not claiming the consent to search the cell phone was not voluntary you don't contest that you simply seem to be claiming that the events leading up to checking the cell phone the searching for a weapon that that had a certain degree of flagrancy that it maintained the use of the fruit of the poisonous tree to suppress the cell phone is that a fair statement yes your honor we are maintaining that there were two separate individual fourth that everything that flowed from that frisk must be suppressed as the fruit of the poisonous tree and that would include the cell phone and that would include regardless of whether the magistrate judge found that the search of the cell phone was pursuant to consent you can see the search of the cell phone was based on defendant's consent your honor I think we would concede at the very least that that's what the court found and we didn't challenge that on appeal so but nevertheless we maintain that that's not where the focus is the focus is much further back at the frisk and we have argued that there are two separate constitutional violations here either of and second that the scope of that frisk exceeded constitutional bounds and then lastly we argue that the evidence seized as a result of these violations including the images found on the phone and the statements must be suppressed as the fruit of the poisonous tree and in that regard the government does make a lot of the fact that the court found that it was consensual that the search was pursuant to consent but the fact of the matter is that the court found that it was an independent act of free will that was and there was no intervening circumstances that purged the taint and in fact there's been several cases as far as independent free will as I understand it the individual stopped for a traffic violation that's not contested at a home suspected of being a drug house after making a trip that lasted the duration of time that it would take to go from the drug house to where you picked up drugs and come back to the drug house there was a frisk then during the frisk searching for weapons which officers are certainly entitled to do felt a bulge and maybe his shirt pocket after manipulating it stopped immediately ask defendant what's in your shirt and he replied a dime of cocaine a dime bag or something whatever the terminology is then handcuffed they proceed into the home and about maybe 20 minutes later the defendant tells them to please take his cell phone and remove photographs pornographic because he doesn't want his father to see them and on the officers doing what he asked them to do more than consent they didn't say may we search your cell phone he said please do this take those off my sequence of events your honor that is that is an outline of sequence of events we however maintain that there's there's other circumstances here in in the frisk itself in the scope of the frisk that makes the frisk itself unconstitutional so I want to back up a little bit if I like even if the frisk is unconstitutional and seizing the cocaine and that's not an issue here whether the cocaine this this man's on a federal child pornography a violation so but there wasn't a break of about 20 minutes before he said to them please get those photographs off my cell phone and that's why I have difficulty seeing that the frisk and the search for the weapon flow into this separate request for the officers to clear his cell phone your honor I I understand that you're focused on the fruit of the poisonous tree and so I'm gonna are you I'm gonna go to that is there something else I'm not I was gonna go with the frisk but I think if you're making the therefore there isn't there's it's there's no violation here I would point out this even with the consent first of all for looking at the fruit of the poisonous tree there is an and it's it's significant I think that the district court and the court below made no findings in this regard all right they made no findings because they found that the position that the court can find on this record that there was a sufficient break to there was no sufficient break to purge that taint that it was not an independent act of free will but at the very least if the court does not agree with that the court would have to send this back for the lower courts to make that finding nevertheless we believe the court can we have to do that why couldn't we read the record ourselves that's what I said I said I believe you can make that finding yourself that it that there was no sufficient break but we could likewise make the finding there was a sufficient break viewing the record and we can affirm a judgment on any basis supported by the record well it has to be reasonably supported by the right your honor and in in this case there's three factors the court looks at and that's not disputed they look at the temporal proximity of the consent and the violation the court looks at the whether there are any intervening circumstances and then the court looks at the flagrancy of the conduct flagrancy of the prior conduct yes your honor and in this case we maintain that all of those factors support mr. mr. Montgomery first of all it's clear that it was everything took place within the space of less than one hour even if you go with what the magistrate judge found that despite the very disconnected the gross inconsistency in the testimony between officer Morellas and officer Casares is when the phone was searched was it searched before they searched the house or after the house even if it was searched after the house as officer Casares said it was still within 40 minutes 20 or 40 they searched the house at 122 I said it lasted about 20 minutes so it was about 40 minutes after that they searched the phone 40 minutes after the frisk after the frisk right exactly so it's very close in time I think in Brown it was two hours again your honor the magistrate judge didn't make a finding on that I mean it was very unclear on the record was it it was it on top of the car was it in the car was it there was no finding on that where the phone was does that have any significance with regard to our analysis it where the phone was found from our position from what we're arguing it doesn't I mean if we were if we were arguing about you know incident to arrest it could have been incident to arrest I believe under Gantt but that's the court didn't you know we maintain that you can back up much further and that this was all the they can really contest this was close in time the facts are what they are the government focuses on the fact that that he was given Miranda warnings that given Miranda warnings after he was frisked after he was frisked and handcuffed right he was given Miranda warnings after his frisks and handcuffed he was permitted to enter the residence to get his nebulizer and he'd had he'd been arrested once before so he had some prior experience what was his prior offense it was a robbery and I believe it was about 10 years ago I don't know it was a while back this the cases are clear your honor that Miranda warnings themselves are not enough but it's a factor it's a factor it isn't indeed a factor as are as his prior experience but here you I think what's what's important to remember here is that he was under arrest he had he was clearly feared that there was incriminating evidence that would be found on his phone but he said to the officers I want you to remove those photographs I don't want my father to see him there was the officers hadn't searched his cell phone or even made an effort to he's the one that brought up the cell phone your honor he was clearly worried though there's no doubt about that that he was clearly worried about what would be found I mean he's definitely under a lot of pressure and you know really this is not like like in Johnson Supreme Court decision I believe it's in Riley come down that you know I can't search a cell phone when did that come down in proximity to this to this arrest well it was it before it was after the arrest definitely after the arrest so at that time the officers were certainly believing that they could search the phone but that was not the case well was that ask it at the suppression hearing I'm sorry well the officers asked at the suppression hearing did you believe you could search the phone on your own initiative actually I don't believe they were I don't believe and the defendant did not testify to suppression which is not unusual but he did not testify that is correct but at the time the court's case law under Finley was permitting that search which we now know is it's not permissible at any rate is there any significance counsel to his assertion that he was concerned about his father seeing the pictures versus some the police findings pictures I mean I think that that difference matter at all I think that what he was he was concerned about getting what was on his phone off of his phone he knew he was under arrest he knew there was evidence on that phone and that's what he was concerned about and this is this is not like like Johnson versus Louisiana where I believe they they you know there was a break he went in front of the magistrate judge you know it wasn't like mr. mr. Montgomery got to go home and then come back the next day and then he gave consent and stuff like that it was all happened within a very short frame of time about addressing the constitutionality of elmo of the frisk and the scope of the frisk I'm sorry about addressing the I will yes both whether it was permissible and whether it the scope was exceeded your honor we there was not this reasonable objectively reasonable belief based on specific articulable facts that mr. Montgomery himself was presently armed and dangerous and I think it's important to know about buoy where it says that they have to have even in situations where there's a possibility that any given individuals armed it's significant you've got to have this specific information and while I have time I want to address just to two errors in the government's brief that I that I think are significant and on page 8 the government says that mr. that officer Kazar is recognized recognized mr. Montgomery and I think that's just a they just got the names mixed up in the brief because it's very clear in the testimony that while the defendant mr. officer Casares officer Casares did not recognize mr. Montgomery until much later until they were in the car and after he'd been arrested and then he told him oh you know I know you from the county jail that mr. Montgomery told him that the second and that's on page 8 of the government's brief the second error in the government's brief that I think is significant it's on pages 30 31 and 33 where the government speaks about mr. Montgomery emerge being seen emerging from the residence there is no testimony whatsoever that anybody saw mr. Montgomery coming out of that residence they they didn't even reply brief no your honor I only think so yeah I only just I only focused on this when I was getting ready for this argument but I really want to point it out because I think it's very significant and how about going back to the exceeding the scope I have you covered the arrows I'm sorry arrows in the government's brief have you covered those I believe so yes how about just addressing quickly because you got about I want to say let's go that again I think it's very I think it's important that that the at the very least the magistrate judge and the district court found that this was ambiguous about whether he continued to pat it down we maintain that it was clear I see my time is up but he continued the pat-down that he continued the pat-down after he knew it was not a no as he was required in order to make this legitimate he had to know it was contraband before he knew it was not a weapon and the testimony supports that he did he knew it wasn't a weapon he didn't know it was contraband and he continued the pat-down even if it was for a brief time the fact of the matter is that's the violation right there and at the very least the magistrate judge said that it was ambiguous the district court said it was inconsistent and the government has a burden to prove this by a preponderance of the evidence and at very least that doesn't meet that standard so thank you for letting me to finish the question all right thank you miss thing you've reserved rebuttal time to pick up where you left off and cover anything else all right we're here from the government as Atlantis you want to first address whether the two items mentioned are errors in the government's brief yes I would like to may it please the court amy alanese for the government I would like to address those as to the one on page 8 I recall the testimony as being he he did recognize him this officer had he had been a police officer about nine years and he had been a county jailer for some time before that and he recognized him just sort of generally and then mr. Montgomery gave a fake name he gave his brother's name and he remembered him but he didn't remember his first name and he didn't realize that he'd been given a fake name until sometime later that evening so that's what I believe the record shows as for page 33 that no one saw him coming out of the residence that may be technically true but he he got in the car and he left perhaps more accurate but he was he was at the residency I'm not sure anybody saw him coming out the front door but he was definitely there I'd like I'm looking at page 33 and I assume it's in the paragraph about the same logic applies in this case it says they had a legitimate reason to detain him because the fences then it says totality of circumstance the officers were standing in front of a known drug retail site late at night from which Montgomery had emerged they had seen Montgomery engaging in a very short car trip what's an error about either one of those again I I'm not sure anybody ever said they actually saw him emerging from the trailer home that was there but he was definitely there is a very you can see this is there well I think it's a reasonable assumption from the evidence that was given but I will concede I don't believe any of the off three officers said we saw him coming out the front door and getting in the car it is a brief I'm sorry why is it in the brief I'm sorry your honor I I have no explanation for that but it's a small little residence the driveway is right there he got into this car that was parked there and he left and I do apologize for any misrepresentation on I'd like to move on to the frisk the circumstances here definitely signaled a need for caution as this court said in Micheletti this is one o'clock in the morning the officers were standing in front of this residence because without the traffic offenses with the officer have had any basis for that initial stop well it's arguable possibly that he had reasonable suspicion when he when he saw that this you know knowing everything that he knew he knew about that he knew that drugs were being sold in this residence he'd arrested six or seven people there on apparently narcotic related charges one of them had told him hey the drug dealer has a supplier over here on well you said he knew that drugs were being sold at the residence he didn't know that but when they conducted a search did they find any drugs no they didn't and there's an explanation for that mr. Montgomery told the officer when when after he'd been arrested and he was sitting in the patrol car I knew the police were looking at me because of the arrest of all the customers in the power race how recent what's the proximity of the arrest of the other persons prior to Montgomery being stopped for traffic offenses and he doesn't contest he could have been stopped for those traffic offenses that's not an issue before us but how what's the temporal proximity well there's some officer customers wasn't crystal clear on this there was some examination of him and he says I arrested six or seven people within a few months and I think it kind of gets cut off and there's another question but both the magistrate judge and judge Cason interpreted that as meaning you know a few months before this arrest and it's kind of borne out by what Montgomery says to the officers later he says I knew the police were looking at me so I stopped selling cocaine I haven't been selling cocaine for three weeks and that's why he had no stuff in is there any evidence as to the owner of the home such as was the defendant the owner of the home or is there any evidence about that no your honor I have no information about that at all returning to the frisk yes I was just trying to figure out what happened between the stop and the frisk that that indicated that a frisk was necessary or appropriate because the stop was just for offenses right isn't that what the officer said well that is the reason that they did stop him and approach him but again he had this officer had been looking for some time he knew what was going on he knew that the drug seller would run over and get more supplies from his supplier who was nearby his one of the arrestees at the house or detainees at the house had told him you this place I think it's called Springfield Street the trip takes less than five minutes and he comes right back so he had a new all of this stuff and you know it's 1 a.m. so what he saw was a short trip and a return correct correct like when I leave my watch and go back to get it well those kind of trips it could have been innocent but in the in the totality of the with the drug dealing activities known to be occurring at this place so he said the officer testified several times you know I know that guns in my experience as an officer drug sellers if a man leaves home and gone for a couple of minutes and drives back it looks like a drug deal going on no your honor government's not saying that what we're saying is in this case under this totality of circumstances where the officer has all this prior knowledge of this particular residence and exactly what's going on there he had a right to be concerned about his own safety and those of his fellow officers so what was that prior knowledge again he he knew there were drug sales he he referred to this residence as a known drug house he had arrested six or seven people in the in a few months he knew when it one of those detainees had told him the drug dealer goes when he runs out of supplies he runs over to his supplier over on Springsville Street comes right back it takes less than five minutes and of course this is going on at 1 a.m. and so under the totality of the circumstances we believe the government or the the officer had the right to frisk mr. Montgomery to check for weapons and that's what he did based on his testimony that at the suppression hearing that activities involving drugs are also known to involve weapons yes that was his testimony he said several times and of course he's an officer a long time he said in his experience drug dealers usually carry weapons and and certainly this court has recognized that in many opinions so at the suppression hearing when he testified that he saw a bulge in his shirt pocket and he manipulated the bulge to see if it was a weapon and then it was soft or something and he stopped immediately and asked the was in his testimony was he stopped immediately well on direct examination it pretty much his account is exactly what you said although he never used the word stop immediately on cross-examination there are some very leading questions and but the magistrate judge found that look you none of that is necessary I mean you can't be complaining about leading questions on cross-examination that's kind of what you do on cross-examination it of course it is your honor all right wasn't improper but I guess my point is you have a very smart very educated lawyer you have a not very educated police officer and sometimes that sometimes it can get a little bit twisted but be that as it may magistrate judge Hacker found that none of that testimony established that any improper manipulation had occurred and this is a factual finding that this court is going to review for clear error and it's it's plausible in the light of the record here so it's not clearly erroneous what was was he asked when he what he thought might be in the man's pocket I understand it wasn't that big of bulge I think on cross-examination he said I didn't know what it was and he admits he didn't know what it was and that's when he asked him what is it and he says the dime bag of cocaine but my question is a item that I understood was relatively small I don't know if we have any dimensions for the whip or height or whatever else of the bulge in the pocket but you know reference has been made to a knife or a pistol or a brass knuckles but it just eludes me how the small the bulge in the pocket could be any of those again I did he testify that that was his concern or that he thought this little bulge might be an explosive or anything no in fact I think he said that he knew it wasn't he knew it wasn't he knew it wasn't a pistol or a knife or several I guess he knew it wasn't a pistol or a knife but judge Hacker found that there wasn't any more manipulation after that he just asked him what is that and he said it's cocaine so there's really nothing about the frisk that was improper or that that exceeded the boundaries that were set out in Dickerson in Dickerson of course the initial pat-down frisk had been done and then the officer came back and interesting object that was and Mr. Dickerson's pocket and and the Supreme Court of course found that that was improper that was beyond the scope of a proper Terry frisk but that didn't happen we didn't have any revisiting this entire search took a couple of seconds interrupted by some combative behavior by Mr. Montgomery so there was just nothing improper in the scope of the reasonable argument about the independent act of free will the temporal proximity I looked at the record and I think I think consent to the final consent to search the cell phone given by Mr. Montgomery happened somewhere in 50 to 55 minutes after his arrest that's not as long as some some intervals that have been discussed but this court in Basie talked about the Rawlings case and I think there was a 45 minute interval there second the presence of intervening circumstances we have the best intervening circumstance ever in this case Mr. Montgomery is the one who started talking about the cell phone and photos you know the officers here had no clue they had no clue about their radar at all they thought they had a garden variety drug dealer that they were dealing with but it's Mr. Montgomery who brings all of this up he does so after he's been Mirandized at least once and I know that that is not definitive but it is a factor also he was 53 years old had been in the system for a while he had one conviction but I believe the PSR said he had some other I'm sorry judge he's 53 he was 53 years old and he was worried about his dad seeing the images on the cell phone exactly that was a little odd too but that was that's what he told the officers and third you have the purpose and the flagrancy of the initial initial misconduct well of course we contend there was nothing wrong at all with the frisk or the scope of the frisk but even if there had been something wrong in a two or three second frisk it's not the kind of horrible police conduct that we need to that the that the exclusionary rule should operate to to punish you know it's not like some of the cases that we've had the Amanda's case in this court you had officers trying to force open doors and come in windows and when the lady finally answered the door they had their guns drawn and pointed at her Mississippi Missouri versus Siebert the police kind of cooked up a way where they could get a statement and then they would Miranda's the person to get a post statement opposed to a Miranda statement that they could use in court that was held very egregious Oregon the Elstad basically the police admitted that they were just on a big fishing expedition and they were just you know wanting to see what turned up that's not what happened here there were specific and articulable facts that allowed each step in the police action here so inclusion even if there was something wrong with this frisk or the stop we believe that mr. Montgomery's consent was an independent act of free will and the child pornography was admissible so you you feel like the time delay between assuming the problems with the frisk or such that there isn't a problem coupled with the defendants initiation of this discussion about the phone that the principal fact scenario you the government wrestle that's part of it and again the fact that he's bringing it up the police aren't wanting to get in there and look at these photos that he's drug dealers number but there were just all of these circumstances and just works bill to ask answer your question about the Riley case when I briefed the case the arguments had been heard that we did not have the opinion yet and I kind of felt like it wasn't going to come out in the government's favor so I really I concentrated on the consent for that reason obviously at the time Finley was still good law and the officers could have searched that cell phone anyway you know I I'm not sure we have an answer yet about the retroactivity of Riley but there was at least an argument to be made about good faith reliance on Finley at the time but it's not made in your brief no unless someone anyone has any more questions all right thank you we have your argument all right miss Ling you have rebuttal I just first want to address this issue about whether officer Kazar is recognized mr. Montgomery and I just have to disagree with the government because the if you would just elevate your voice a bit okay I have to disagree with the government on that that that the officer testified he recognized Montgomery that's not the case if you look at the record on page 686 the question did you know who he was answer I did not know who he was at the time I just knew that they did drugs there I didn't know it was mr. Montgomery so he clearly did not know who he was at the time regard to the frisk in fact they knew nothing about him the government has conceded that they didn't see him coming out of the house the evidence about the recency there's there's no way to interpret over a few months with what the actual testimony was is within a few months it's just there's just no testimony about when this occurred when they'd last seen that been aware of any drug dealing in there and I think with regard to the guns I think it's very significant also that there was no testimony whatsoever that they'd ever heard or found or knew anything had any information that there was any weapons involved in that in from any drug dealing at that house at any time this we've discussed the coal case in our brief and I do believe that this case is very much on point with coal in that case there was actually probable cause that there was drugs in the house we didn't have that here those officers were not on that street doing surveillance they were just happened to be on that street because they were making it they've been called there for an arrest of a petty theft they were not there surveilling that house on the suspicion of drugs so it's it's even stronger than coal but one of the officers that participated in the arrest testified that he had arrested several persons previously in that home associated with that home that is correct but and what was that officer's name that was officer Casares that was the arresting officer but again there was no there was no testimony or no testimony that can reasonably be interpreted as being recent that they had recently done that and it could have been any time and it could have been stale information for all we know it was not like coal where there was a drug warrant that was being actually executed at that place and they still found that when the person who drove up they should not have frisked him because there was nothing you can't just be there with regards to the scope of the frisk again circling back to that some of the testimony given was they knew that it took about five minutes to make a round trip to the site where you picked up drugs to sell at the home so I guess that was the wholesaler and the home was the retail who testified to that that was again was officer Casares he was the one who mainly testified and so he testified that he knew that at the time he stopped the defendant that it took about five minutes to make the round trip that is correct but he never testified that he saw the defendant get it come out of the house or get in the Montgomery was a drug dealer he never testified that he had ever seen mr. Montgomery being in well had he seen a car leave and come back within five minutes it turned out to be Montgomery Montgomery was got up he didn't that was in that car oh he saw the car leave the house then he saw it five minutes later return that is correct and the person that emerged was Montgomery Montgomery but again he had to believe that he was basis for him to believe that on these facts the fact that other than he believed it was a drug-related activity but that that doesn't meet Buie's standard your honor that you've got to have specific facts about this individual Buie clearly said that even in places where is there significant possibility that the person that there people could be armed you have to have belief that this specific person was and again I go back to the fact that there have never been any testimony about weapons being involved in any of this and they didn't know anything about mr. Montgomery they didn't know who he was or anything about him I'd like to go quickly to the frisk I've got very few minutes again it's I think it's very significant he the officer testified it was felt the size of a gum wrapper the size of a receipt there was no way he could he testified he knew it wasn't a weapon and in fact there was no way he at the very least the court did both courts found that it was ambiguous or inconsistent about the timing of this and so we asked the court to reverse and remand thank you very much thank you thank you counsel